# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 2:17-CV-02715 (JFB)

———————————

STACEY GARCIA,

Plaintiff,

VERSUS

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
March 27, 2019

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Stacey L. Garcia ("plaintiff"), proceeding *pro se*, commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act") on April 28, 2017, challenging the final decision of the Acting Commissioner of Social Security (the "Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") on June 22, 2015.[1] An ALJ determined that plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a), with certain limitations. The ALJ found that there were a significant number of jobs in the national economy that plaintiff could perform despite these limitations, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

The Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff did not file an opposition or a cross-motion. In any event, the Court has still considered the merits of the petition. For the reasons set forth below, the Court denies the

---

[1] Plaintiff's SSI claim was initially denied on February 27, 2013 following her first hearing before Administrative Law Judge ("ALJ") April M. Wexler ("Wexler"). (Administrative Record ("AR") at 90-97.) After the Appeals Council remanded the case, a second hearing was held before ALJ Wexler on April 13, 2015. (*Id.* at 63-85.)

Commissioner's motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

I. FACTUAL BACKGROUND

The following summary of the relevant facts is based on the Administrative Record ("AR") developed by the ALJ. (ECF No. 20.)

A. Personal History

Plaintiff was born on January 6, 1970. (AR at 46, 67.) Plaintiff was 39 years of age at the onset of her alleged disability on April 29, 2009, and 45 years of age at the time of the second hearing before the ALJ in this case on April 13, 2015. (*Id.* at 46, 56, 67.) She resides with her fiancé in an apartment in Riverhead, New York. (*Id.* at 46, 67.) Plaintiff completed tenth grade, but then left school because it was difficult for her to do the work. (*Id.* at 46, 68.) Aside from working three days a week as a cashier at a local store from 1990 until December 1993, plaintiff has no work history. (*Id.* at 262.) Plaintiff testified that she did not work because she was taking care of her young children. (*Id.* at 47.) At the time of plaintiff's first hearing before the ALJ on February 19, 2013, her children were 22 and 24 years of age. (*Id.* at 47.) Plaintiff's fiancé is currently working full-time and supporting her. (*Id.* at 46, 68.)

Plaintiff testified that she is unable to work due to spinal problems, including spinal stenosis, sciatica, herniated discs (*id.* at 47, 49), irritable bowels, celiac disease, polycystic ovarian syndrome, type II diabetes, migraines, plantar fasciitis, high blood pressure and asthma (*id.* at 68-69, 73, 74).

Section C, discussing plaintiff's testimony at her hearings before the ALJ, includes additional information about plaintiff's personal history, injuries, and symptoms.

B. Relevant Medical History

1. Medical Evidence Before the April 29, 2009 Alleged Onset Date

On May 12, and June 25, 2003, plaintiff was examined by Dr. Ira Chernoff at New York Orthopedic Spinal Associates for neck, back, chest, and leg pain associated with a fall she took in 2001. (*Id.* at 342-45.) Upon physical examination on May 12, 2003, plaintiff had normal sensation in the upper and lower extremities; power testing was 5/5 in both the upper and lower extremities; she was able to heel walk and toe walk; she was able to forward bend minimally and hyperextend minimally; her hips had a normal range of motion; and she had a good range of motion of the shoulders. (*Id.* at 343.) Dr. Chernoff's impression was fibromyalgia with multiple tender spots, and he recommended that plaintiff see a rheumatologist. (*Id.*) He also noted that she may have a little lipoma in the muscles on her back on the right side and mentioned possibly repeating a magnetic resonance imaging ("MRI") for soft tissue evaluation. (*Id.*) On June 25, 2003, plaintiff was seen again by Dr. Chernoff for follow-up. (*Id.* at 344.) He noted that, on physical exam, plaintiff was able to ambulate and that she had some nodules in her back. (*Id.*) Dr. Chernoff again recommended that plaintiff see a rheumatologist and ordered an MRI of her lumbar spine. (*Id.*)

On July 9, 2003, plaintiff was seen by Dr. Chernoff to review the results of her June 30, 2003 MRI of the soft tissue in her back, which were "essentially unremarkable," but showed some possible lumbar fasciitis and an L5-S1 disc bulge or herniation. (*Id.* at 346, 352.) Dr. Chernoff noted that plaintiff was

able to ambulate and he assessed fibromyalgia with multiple tender spots. (*Id.*)

On October 8, 2003, Dr. Marc Chernoff from New York Orthopedic Spinal Associates ordered an MRI of the lumbar spine for plaintiff following her complaints of left leg and buttock pain. (*Id.* at 348.) Upon examination, he noted decreased sensation in the left L5 compared to the right and some weakness in the left hamstrings compared to the right, which were 4/5 on the left and 5/5 on the right. (*Id.*) Dr. Chernoff also noted that plaintiff had 5/5 strength in the quadriceps, tibialis anterior, EHL and plantar flexors. (*Id.*) His impression was left sciatica with S1 radiculopathy on the left side. (*Id.*)

On October 22, 2003, Dr. Ira Chernoff reviewed the MRI report of plaintiff's lumbar spine and noted spinal stenosis at L4-5 with a central disc herniation and a herniated disc at L5-S1 on the left. (*Id.* at 347.) Plaintiff was seen again by Dr. Chernoff for follow-up on October 29, 2003 and November 26, 2003, when he assessed sciatica in the left leg with an S1 radiculopathy on the left. (*Id.* at 350-51.) He also noted that plaintiff was able to heel walk and toe walk, but had weakness in the hamstrings, and that though she was able to ambulate, she had a lot of pain in the left leg. (*Id.* at 350-51.) Dr. Chernoff recommended surgery or an epidural steroid injection. (*Id.*)

Plaintiff was treated by Dr. Joseph Spataro, a gynecologist, between 2006 and 2013 for numerous disorders, including endometriosis, polycystic ovarian syndrome, vaginal and urinary tract infections, group B-strep, and herpes infections. (*Id.* at 366-76, 501-02.)

A radiology report of plaintiff's lungs dated October 10, 2008 showed no acute abnormality, but noted minimal paravertebral osteophyte formation. (*Id.* at 358.) On October 31, 2008, plaintiff had a renal sonogram which showed prominent kidneys with no hydronephrosis (*id.* at 382), and a pelvic ultrasound which was "grossly unremarkable" (*id.* at 473).

Between 2009 and 2013, plaintiff was seen by various doctors at Island Urgent Medical Care ("IUMC"), serving as her primary doctors. On April 21, 2009, Dr. Bellamy Brook at IUMC assessed plaintiff with vaginitis, dysuria, and multiple medical problems. (*Id.* at 323.) On April 27, 2009, plaintiff was seen by Dr. Brook for a follow-up visit. (*Id.* at 322.) Dr. Brook assessed dry skin lesions, positive ASO, elevated blood pressure without diagnosis of hypertension, and low protein. (*Id.*)

A renal sonogram performed on April 29, 2009, showed "prominent, but otherwise normal-appearing kidneys" and was unchanged from plaintiff's 2008 sonogram. (*Id.* at 290.)

2. Medical Evidence After the April 29, 2009 Alleged Onset Date

On May 12, 2009, plaintiff was examined by Dr. Sachin Chopra at IUMC for nausea, vomiting diarrhea, and abdominal pain. (*Id.* at 320.) Dr. Chopra recommended that plaintiff follow the BRAT diet and provided a prescription for Protonix. (*Id.* at 321.) Plaintiff was recommended to follow-up with gastroenterology, a gynecologist for her polycystic ovarian syndrome, an infectious disease specialist and dermatologist for her skin nodules, and to return to the clinic for routine fasting blood work and healthcare maintenance testing. (*Id.*)

On May 15, 2009, plaintiff was examined by a physician assistant at IUMC for viral symptoms, asthma, and diarrhea. (*Id.* at 319.) A chest x-ray was ordered, which was negative. (*Id.* at 291.)

Plaintiff was examined by Dr. Brook at IUMC on June 1, 2009. (*Id.* at 318.) She was assessed with multiple medical problems, including plantar fasciitis, dental abscess, low-grade fever, and rash. (*Id.*)

On September 1, 2009, plaintiff was examined by Dr. Chopra at IUMC for back pain. (*Id.* at 317.) Dr. Chopra assessed plaintiff with chronic low back pain, fatty liver disease, diabetes mellitus, polycystic ovarian syndrome, hematuria, and headaches. (*Id.*) She recommended that plaintiff follow-up with specialists, including endocrine, gynecology, gastroenterology, and neurology. (*Id.*)

On September 21, 2009, at her follow-up appointment with Dr. Chopra, plaintiff reported feeling well with no complaints. (*Id.* at 314.) Dr. Chopra assessed hypertriglyceridemia for which she recommended prescription medication, but plaintiff refused due to the cost. (*Id.*) She also assessed chronic low back pain with stable symptoms. (*Id.*) Dr. Chopra recommended that plaintiff follow-up with endocrinology for diabetes. (*Id.*)

On August 2, 2010, plaintiff was seen by Dr. Kerry Murphy at IUMC for a sore throat, body aches, and fever. (*Id.* at 312.) Upon examination, plaintiff had full range of motion in her neck with positive shotty anterior cervical lymphadenopathy. (*Id.*) She was assessed with sore throat, asthma, irritable bowel, polycystic ovary, and obesity. (*Id.*)

On October 15, 2010, plaintiff was seen for follow-up by Dr. Murphy at IUMC. (*Id.* at 311.) She assessed upper respiratory infection, polycystic ovary disease and microalbuminuria. (*Id.*)

On October 19, 2010, plaintiff was seen by a physician assistant at IUMC for follow-up and was assessed with proteinuria, hematuria, and fatigue. (*Id.* at 310.) She was told to follow-up with Dr. Murphy to review lab results. (*Id.*)

On November 26, 2010, plaintiff was seen by Dr. Murphy who noted that the plaintiff "offer[ed] multiple complaints and [was] difficult to keep on track." (*Id.* 309.) Plaintiff's urine results showed an abnormal creatinine clearance and she was referred to nephrology for evaluation. (*Id.*)

On December 15, 2010, Dr. Sharmini Jayamaha, a nephrologist from East End Nephrology, P.C., performed an evaluation of plaintiff upon Dr. Murphy's referral for proteinuria. (*Id.* at 553.) Dr. Jayamaha assessed mild proteinuria and possible early diabetes. (*Id.* at 554.) She also assessed possible hypertension; plaintiff's diastolic blood pressure was high, but she noted that it might be due to plaintiff's stress level during the office visit, as she had brought her baby with her. (*Id.*) Dr. Jayamaha ordered a renal sonogram which was performed on January 11, 2010, and revealed "[e]ssentially normal appearing kidneys." (*Id.* at 539.)[2]

Between August 2012 and January 2013, plaintiff was seen numerous times by various physician assistants at IUMC. (*Id.* at 487-500.) During these visits, plaintiff was assessed with migraines, chronic sinusitis, lower back pain, abdominal pain, left leg pain, and morbid obesity; she was diagnosed with acute bronchitis, asthma, uncomplicated

---

[2] The record contains handwritten treatment notes, dated January 2013 through October 2014, from East End Nephrology, PC, which are illegible. (*Id.* at 638-47.)

type II diabetes, urinary tract infection, herpes, headache and wheezing. (*Id.*)

On September 14, 2012, a transvaginal sonogram performed on plaintiff showed a small uterine myoma, a sub-centimeter cyst, and was otherwise remarkable. (*Id.* at 423.) An abdominal sonogram was also performed that day and showed hepatomegaly with fatty infiltration of the liver. (*Id.* at 424.)

On January 6, 2013, an ultrasound and doppler of plaintiff's legs were performed. (*Id.* at 579.) The radiology report provides: negative arterial doppler of the bilateral lower extremities and no evidence of deep venous thrombosis in either leg. (*Id.*) On January 16, 2013, plaintiff was seen by a physician assistant at IUMC to review the test results. (*Id.* at 487.) Plaintiff was assessed with migraine, lower back pain, diabetes mellitus, elevated liver function, and chronic sinusitis and was referred to an orthopedist and gastroenterologist; brain, lumbar and cervical MRIs were ordered. (*Id.* at 488.)

On February 15, 2013, plaintiff was seen by Dr. Murphy at IUMC for asthma. (*Id.* at 588.) Plaintiff stated that she had only been using Albuterol because insurance would not cover her prior prescription for Singular. (*Id.*) Dr. Murphy noted that the plaintiff was argumentative throughout the visit and that her poor cooperation made it difficult to assess her condition. (*Id.*) Dr. Murphy also noted that she spent in excess of an hour and fifty minutes with plaintiff during this visit. (*Id.* at 589.) Plaintiff had numerous somatic complaints, including mid-low back pain and palpable spasm on the left side of her back. (*Id.*) Upon physical exam, Dr. Murphy noted tenderness along plaintiff's paraspinal musculature bilaterally from the thoracic spine to the lower lumbar spine, and tender and palpable muscle spasm to the left of T12-L1. (*Id.*) Dr. Murphy assessed not well-controlled asthma, polyuria, back pain, and

hyperlipidemia/triglyceridemia. (*Id.*) A chest x-ray performed revealed no acute infiltrate. (*Id.* at 588.) Plaintiff was prescribed Pulmicort and instructed to continue Albuterol. (*Id.* at 589.) During this visit, plaintiff requested medical records for her disability court hearing scheduled for February 19, 2013. (*Id.* at 588.)

Dr. Murphy provided a letter, dated February 18, 2013, summarizing plaintiff's medical history since April 2009. (*Id.* at 356.) Dr. Murphy's letter states that plaintiff has multiple somatic complaints, including asthma, reported celiac disease, irritable bowel syndrome, reported polycystic ovaries, borderline diabetes, chronic sinus congestion, recurrent migraine headaches, chronic generalized pain, polyuria, persistent proteinuria, and persistent vaginal discharge. (*Id.*) Plaintiff's past medical history includes morbid obesity, asthma, irritable bowel syndrome, borderline diabetes, with polyuria, proteinuria, recurrent strep pharyngitis, and recurrent urinary tract infections. (*Id.*) "[The patient] feels that she cannot work and [is] interested in securing long term disability benefits. It is recommended that a review of the medical records for the purpose of making this determination." (*Id.*)

On February 26, 2013, plaintiff was seen by Dr. Joshua Weaver, a neurologist from South Shore Neurologic Associates, P.C., for headaches of ten years duration. (*Id.* at 593-99.) Upon physical examination, Dr. Weaver noted intact balance and gait, intact coordination, 5/5 strength bilaterally in plaintiff's arms and legs, and tenderness in the paraspinal regions, spinal areas, and in the cervical and lumbosacral regions with multiple tender points. (*Id.* at 598-99.) Dr. Weaver assessed plaintiff with chronic headache, chronic neck pain, chronic low back pain, chronic limb pain, chronic fatigue/malaise, chronic myalgia and myositis, chronic abnormality of gait, and

chronic carpal tunnel syndrome. (*Id.* at 599.) Dr. Weaver ordered an MRI and electromyography ("EMG"). (*Id.*)

### 3. Medical Evidence after the February 27, 2013 Denial of Benefits

A cervical MRI, performed on April 5, 2013, showed posterior central disc herniation at C3/4, posterior left paracentral and left foraminal disc herniation at C4/5 with impingement of the existing left C5 nerve root, and posterior left paracentral and left foraminal disc herniation at C5/6 with impingement of the existing C6 nerve root. (*Id.* at 678.) The MRI report also noted that there was no abnormal cord intensity noted, and no vertebral facture, intraosseous lesion anterolisthesis or facet arthrosis. (*Id.* at 679.) A brain MRI performed that same day showed no abnormalities. (*Id.* at 680.) An MRI of the lumbar spine performed that day showed moderate central and bilateral foraminal stenosis at L3/4 with disc space narrowing and posterior disc bulging; L4/5 and L5/S1 disc space narrowing, posterior disc bulging and bilateral foraminal impingement, facet hypertrophy; L2/3 disc bulge; and moderate spondylosis and increased lumbar lordosis. (*Id.* at 681-82.)

Plaintiff followed up with Dr. Weaver on April 10, 2013, and described her headaches as mild. (*Id.* at 619.) Dr. Weaver noted that plaintiff has headaches which are possibly migraine headaches and/or related to underlying myofascial pain syndrome. (*Id.* at 623.) Dr. Weaver noted that plaintiff takes 800-1600 milligrams of ibuprofen, Aleve or Excedrin for pain. (*Id.* at 619.) After reviewing the April MRIs, Dr. Weaver's assessments remained the same from February, but he recommended physical therapy for back/neck pain symptoms, an MRI of her thoracic spine, an orthopedic consult, and a rehabilitation medicine consult. (*Id.* at 623.)

An EMG/Nerve conduction interpretation report of the plaintiff's lower extremities, dated April 24, 2013, reports that there was no evidence of lower extremity sensory motor polyneuropathy. (*Id.* at 674.) The report notes that the study was very limited as the plaintiff refused needle EMG. (*Id.*) An April 29, 2013 EMG/Nerve conduction interpretation report of plaintiff's upper extremities provides that there is moderate entrapment to the left median nerve at the wrist consistent with moderate left carpal tunnel syndrome, which has not resulted in any significant axonal degeneration; and that there is no definitive evidence of an upper extremity myopathy, polyneuropathy or cervical radiculopathy bilaterally. (*Id.* at 671.)

On May 22, 2013, plaintiff was seen by Dr. Weaver again for headaches with mild symptoms. (*Id.* at 648.) Dr. Weaver noted that plaintiff had not had an orthopedic or rehabilitation consult yet, had not gone for physical therapy, and had not had an MRI of her thoracic spine. (*Id.* at 649.) He assessed no motor weakness or sensory loss, and that balance and gait were intact, but that there were multiple tender points along the cervical and lumbosacral paraspinal musculature. (*Id.* at 654.) He noted that the Flexeril helps plaintiff's pain and helps her sleep at night. (*Id.* at 649.) Dr. Weaver instructed that plaintiff follow-up with her gynecologist and primary care doctor for other medical issues, and advised a healthy diet and weight loss. (*Id.* at 655.) His assessment plan included the following chronic conditions: cervical radiculopathy, headache, cervicalgia, lumbago, pain in limb, unspecified myalgia and myositis, carpal tunnel syndrome, and backache. (*Id.* at 654-55.)

On May 22, 2013, plaintiff was also examined by Dr. Seth Persky, a gastroenterologist from Long Island Digestive Disease Consultants for chronic

diarrhea. (*Id.* at 548.) He noted that plaintiff complained of 6-12 bowel movements a day for six years. (*Id.*) Plaintiff informed Dr. Persky that she was diagnosed with celiac disease as a baby, but that she does not always follow a gluten free diet. (*Id.*) Dr. Persky ordered a colonoscopy and endoscopy. (*Id.* at 550.)

A June 5, 2013 MRI report of plaintiff's thoracic spine showed the following: moderate spondylosis; multilevel disc space narrowing, desiccation and bulging T6/7 through T10/11 inclusively without focal disc herniation, central or foraminal stenosis; and no abnormal cord signal intensity identified. (*Id.* at 677.)

A letter, dated June 17, 2013, from Dr. Spataro, plaintiff's gynecologist, states that plaintiff has been a patient of his since 2006 for multiple disorders, including endometriosis, polycystic ovarian syndrome, recurrent vaginal and urinary tract infections, Group B strep, herpes, severe migraine headaches, fibromyalgia, sciatica, lumbar spinal discomfort due to herniated discs and arthritis. (*Id.* at 501.) He stated that, in some cases, he has referred plaintiff to additional subspecialists for further evaluation and treatment. (*Id.*) The letter also states that plaintiff's endometriosis, fibromyalgia and herniated discs have altered plaintiff's activity level with certain activity restrictions and have hampered her quality of life. (*Id.* at 501-02.)

On November 7, 2013, Dr. John Veliath from IUMC treated plaintiff for an upper respiratory infection. (*Id.* at 602-03.) On November 19, 2013, plaintiff returned to Dr. Veliath complaining of bronchitis. (*Id.* at 606.) Dr. Veliath assessed that plaintiff's upper respiratory infection was resolving and refilled her medication. (*Id.* at 607.)

On February 25, 2014, plaintiff was seen again by Dr. Persky for rectal bleeding and pain. (*Id.* at 545.) He noted that plaintiff continued to have loose stools 6-12 times a day, but that she never had the colonoscopy or endoscopy which he previously recommended. (*Id.*) Plaintiff was assessed with hemorrhoids, rectal bleeding and diarrhea. (*Id.* at 547.)

On March 26, 2014, Dr. Persky performed a colonoscopy and upper endoscopy on plaintiff. (*Id.* at 526.) Findings were normal other than a diagnosis of diverticulosis and internal hemorrhoids. (*Id.*)

On April 25, 2014, plaintiff was again seen by Dr. Veliath at IUMC for a runny nose and a medication refill. (*Id.* at 636.) Plaintiff requested and was provided with a prescription for a pelvic ultrasound and mammogram screening. (*Id.*) She was assessed with hypertension and hyperlipidemia. (*Id.* at 637.)

On October 22, 2014, Dr. Mitchell Caplin, of Stat Health, PC diagnosed plaintiff with acute bronchitis and asthma. (*Id.* at 683.)

On March 24, 2015, plaintiff was seen by Dr. Veliath at IUMC for missing a menstrual cycle, nausea, fatigue, sinus/chest congestion, and nose bleeds. (*Id.* at 716.) Upon examination, plaintiff was diagnosed with a urinary tract infection. (*Id.* at 717.)

On April 14, 2015, plaintiff was treated by Dr. Robert Baranowski, M.D., a gastroenterologist from Long Island Digestive Consultants for chronic irritable bowel syndrome with diarrhea, rectal bleeding, frequent stools and stomach pain.[3]

---

[3] The Court notes that Dr. Baranowski and Dr. Persky both work at Long Island Digestive Consultants.

(*Id.* at 685-86.) Dr. Baranowski diagnosed plaintiff with the following: abnormal liver tests, diarrhea, hemorrhoids, morbid obesity and rectal bleeding. (*Id.* at 685.) That same day, Dr. Baranowski completed a Medical Source Statement of Ability to do Work-Related Activities. (*Id.* at 687-690.) He concluded that based on plaintiff's morbid obesity, severe irritable bowel syndrome, migraines and severe back disease, plaintiff had the following exertional limitations: plaintiff can occasionally/frequently lift and carry less than ten pounds, stand/walk less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday, and had limited ability in both upper and lower extremities to push/pull. (*Id.* at 687-88.) He also opined that plaintiff had the following postural limitations: she can never climb ramps, stairs, ladders, rope, or scaffolds; kneel, crouch, crawl or stoop; and only occasionally balance. (*Id.* at 688.) Dr. Baranowski found that plaintiff had the following manipulative limitations: she was limited in reaching in all directions, fingering (fine manipulation), and feeling (skin receptors); and unlimited in handling (gross manipulation). (*Id.* at 689.) Plaintiff could occasionally reach, finger and feel; and frequently handle. (*Id.*) With regard to visual/communication limitations, Dr. Baranowski opined that plaintiff was limited in seeing and hearing, but unlimited in speaking. (*Id.*) Finally, concerning environmental limitations, he concluded that plaintiff was limited in regard to temperature extremes, noise, dust, humidity/wetness, fumes, odors, chemicals and gases; but was unlimited in regard to vibrations and hazards. (*Id.* at 690.)

Dr. Baranowski also completed a Gastrointestinal Disorders Disability Questionnaire which stated that this was the first time he had examined plaintiff. (*Id.* at 691.) He diagnosed plaintiff with malabsorption and celiac disease and found that plaintiff suffered from chronic diarrhea, nausea, abdominal pain and cramps, malaise and blood in stool. (*Id.* at 691-92.) He reported that an elevated liver function test supported his diagnosis. (*Id.*) He reported plaintiff's symptoms, including chronic diarrhea 4-10 times a day with occasional blood from hemorrhoids, fatigue, and cramps were severe enough to constantly interfere with her attention and concentration. (*Id.* at 691-94.) He reported that plaintiff had daily abdominal cramping rated 3 to 10 and that eating and stress lead to pain. (*Id.* at 693.) Dr. Baranowski did not prescribe any medications for plaintiff. (*Id.*) He opined that plaintiff's impairments lasted or can be expected to last at least twelve months and that plaintiff has had these symptoms and limitations for twenty-five to thirty years. (*Id.* at 694, 696.) He reported that plaintiff's irritable bowel syndrome is exacerbated by stress and that plaintiff was incapable of even "low stress" at work. (*Id.* at 694.) In assessing plaintiff's residual functional capacity, Dr. Baranowski opined that, in an eight-hour work day, plaintiff could sit for one hour and stand/walk for one hour. (*Id.* at 695.) He further opined that plaintiff could occasionally lift up to ten pounds and occasionally carry up to five pounds. (*Id.*) In a full-time work environment, plaintiff would need to alternate positions between sitting and standing/walking every thirty minutes and would need to stand for five to fifteen minutes before returning to a seated position. (*Id.*) He opined that plaintiff would have good days and bad days and estimated that plaintiff would likely be absent from work more than three times a month due to her impairments. (*Id.* at 696.) Plaintiff's condition does not make her prone to frequent infections, but requires ready access to a restroom. (*Id.*)

4. Consultative Examiner and Impartial Medical Expert Opinions

On November 30, 2011, Dr. Saadua Wasty, referred by the Division of Disability Determination, conducted a consultative internal medical examination of plaintiff. (*Id.* at 324-29.) Dr. Wasty noted that plaintiff reported that she has had neck pain and low back pain for approximately twenty years, and that she was told she had scoliosis of her low back and bulging discs in her neck. (*Id.* at 324.) Plaintiff told Dr. Wasty that she fell in 2001 which has made her pain worse. (*Id.*) Plaintiff described the pain in her neck and back as a constant ache with severe sharp exacerbations. (*Id.*) She reported that the pain is aggravated with long periods of sitting, standing and walking, and that the pain is 8 to 10 out of 10. (*Id.*) Plaintiff stated that she had physical therapy which did not relieve the pain and has declined the recommended surgery. (*Id.*) Plaintiff also reported that she was told she has thoracic arthritis and that she was diagnosed with carpal tunnel syndrome in her left hand. (*Id.*) Plaintiff is left handed. (*Id.*) Plaintiff describes her hand pain as a 6 out of 10. (*Id.*) Plaintiff reported that she was diagnosed with fibromyalgia in 2002 by a rheumatologist. (*Id.*) She stated that she has pain all over her body which is a 9 out of 10 and she has numerous painful nodules all over her back and arms. (*Id.*) She reported that she also has experienced migraine headaches for approximately seven years associated with nausea, vomiting, sensitivity to light and noise. (*Id.* at 325.) She stated that the migraines are usually on the right side of her head and the pain is a 10 out of 10. (*Id.*) Pain medication and sleep help her migraines. (*Id.*) Plaintiff also reported that in 2008 she was diagnosed with polycystic ovarian syndrome for which she takes medication. (*Id.*) Plaintiff stated that she has had irritable bowel syndrome since her twenties and celiac

disease since her childhood, and that she maintains a gluten free diet. (*Id.*) She stated that she has to go to the bathroom around 6 to 14 times per day and has intermittent discomfort in her bottom that is a 9 out of 10. (*Id.*) Plaintiff reported that she was diagnosed with asthma in 1977 which she treats with a nebulizer and inhalers. (*Id.*) She stated that she has never been admitted to a hospital for her asthma and denies having shortness of breath while walking short distances and climbing stairs. (*Id.*) Plaintiff reported that she had a cholecystectomy, hernia repair and liver biopsy at LIJ Hospital in 2004. (*Id.*) She denied having high blood pressure, diabetes, heart attack, other heart disease, emphysema and seizures. (*Id.*) Plaintiff reported that she currently takes the following medications: Metformin, Zyrtec, Proventil, and Fluticasone. (*Id.*)

Dr. Wasty examined plaintiff and found that she measured 5'6 and weighed 280 pounds. (*Id.* at 326.) Dr. Wasty observed that plaintiff walked with a limp, declined to walk on her toes and heels, and could only squat one-third of the way down. (*Id.*) Plaintiff maintained a normal stance and did not require any assistance changing for the exam or getting on and off the exam table. (*Id.*) Dr. Wasty noted multiple palpable nodules, which were tender, on plaintiff's arms and back. (*Id.*) She noted that plaintiff had reduced sensation in her left lower extremity, but normal sensation in her right lower extremity and upper extremities bilaterally. (*Id.* at 327-28.) She also noted that plaintiff's strength was 4/5 upper extremities bilaterally and lower extremities bilaterally. (*Id.* at 328.) Dr. Wasty diagnosed plaintiff with the following: low back pain due to scoliosis and spinal stenosis, neck pain due to disc herniation, left hand carpal tunnel syndrome possible, fibromyalgia unlikely, multiple tender nodules bilateral arms and back, migraine headaches, polycystic ovarian syndrome, irritable bowel syndrome, celiac

disease and asthma. (*Id.*) Dr. Wasty opined that plaintiff had moderate to marked limitation to squatting and kneeling; moderate limitation to bending forward; moderate limitation to long periods of sitting, standing and walking; moderate to marked limitation to pushing, pulling, carrying, lifting, and overhead reaching using bilateral arms; and moderate limitation to twisting and turning of her neck. (*Id.*) Plaintiff needed to avoid smoke, dust, and known respiratory irritants. (*Id.*) Dr. Wasty recommended neurological evaluation for possible neurofibromatosis. (*Id.*)

With regard to activities of daily living, plaintiff told Dr. Wasty that she can cook four times a week and clean two times a week with the help of her boyfriend. (*Id.* at 326.) She stated that she does laundry once a month with the help of her boyfriend and does shopping two to three times a month with help. (*Id.*) She reported that she can shower by herself three times a week, but does not bathe herself. (*Id.*) She stated that she can dress herself every day with the help of her boyfriend. (*Id.*) She stated that she watches television, listens to the radio, reads and goes out to do word puzzles and use the computer. (*Id.*) Her hobby is talking on the phone. (*Id.*)

On December 9, 2011, plaintiff's medical file was referred to Dr. Gowd, a state agency medical consultant. (*Id.* at 330-31.) In reviewing plaintiff's medical file, including the consultative examination of Dr. Wasty, Dr. Gowd found "no significant clinical findings except mild to moderate decrease in rom of shoulders and mild decrease in rom of lumbar spine and trigger points noted." (*Id.* at 330.) Dr. Gowd advised that plaintiff could stand and walk for six hours; occasionally lift twenty pounds; occasionally stoop and crouch; and kneel and crawl with no impact. (*Id.*) Based on his review of plaintiff's medical file, Dr. Gowd completed plaintiff's physical residual functional

capacity assessment. (*Id.* at 332-37.) Plaintiff's obesity and pain were factored in his assessment. (*Id.* at 333.) Dr. Gowd's residual functional capacity provided that plaintiff could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and unlimited pushing or pulling. (*Id.* at 333.) Additionally, occasional postural limitations were noted in climbing, balancing, stooping, kneeling, crouching and crawling. (*Id.* at 334.) No manipulative or visual limitations were noted, but even moderate exposure to fumes, odors, dusts, gases, and poor ventilation were to be avoided. (*Id.* at 333-34.) Ultimately, Dr. Gowd assessed that "[plaintiff] is capable of performing [light] work." (*Id.* at 337.)

In an interrogatory dated February 24, 2013, Dr. Michael Falkove, an impartial medical expert, opined that plaintiff's diagnosis of diabetes mellitus, obesity, polycystic ovary syndrome, asthma, and low back pain did not establish a disability. (*Id.* at 510.) Dr. Falkove noted that other than plaintiff's obesity, there were no exhibits to support any disability, including pulmonary function tests, MRI's, EMGs, or X-rays and therefore she has no limitations. (*Id.* at 510-12.)

4. Supplemental Medical Evidence Submitted to Appeals Counsel

Plaintiff submitted three pages of medical records from Stony Brook University Hospital to the Appeals Council, including a pathology report dated July 13, 2016 for a polypectomy and a June 29, 2016 vaginal sonogram which showed a thickened endometrium. (*Id.* at 17-19.)

## C. Relevant Testimonial Evidence

### 1. First Administrative Hearing

The first administrative hearing was held on February 19, 2013 before ALJ Wexler. (*Id.* at 42-62.) Plaintiff, who was represented by counsel, testified that she was 43 years of age and lived with her fiancé who works and supports her. (*Id.* at 44, 46). Plaintiff testified that she completed tenth grade and has not worked in the last fifteen years because she was taking care of her young children, who are now 22 and 24 years of age. (*Id.* at 47.) Plaintiff testified that she is 5'6" and weighs 306 pounds. (*Id.* at 48-49.) She testified that she does not work now because she has spinal problems, specifically, spinal stenosis, sciatica and herniated discs. (*Id.* at 47, 49.) She reported that her most recent MRI is from 2003, but she plans to go for an updated MRI next week. (*Id.* at 49.)

Plaintiff reported that she has polycystic ovarian syndrome, which causes cramps and abdominal pain when she has her period, that she is borderline diabetic, and that she suffers from migraines, asthma and celiac. (*Id.* at 48-50, 55.) She testified that her celiac and migraines further prevent her from being able to work. (*Id.* at 50.) She stated that she has never been hospitalized for her asthma, but that she takes Albuterol and Pulmicort to treat it. (*Id.* at 49.) She testified that her migraines occur about three times a week and last for twelve to fifteen hours a day. (*Id.* at 54.) She stated that she takes Tylenol and ibuprofen to treat her migraines and goes to sleep and stays in the darkness. (*Id.* at 50.) She also stated that her asthma medicine makes her headaches a lot better. (*Id.* at 54.)

Plaintiff stated that she cannot take most pain medications because they contain gluten (*id.* at 50), and that she chooses not to take pain killers like Vicodin "because they have bad side effects" (*id.* at 47). Plaintiff also reported taking Flexeril, Metformin for polycystic ovarian syndrome, and Zyrtec for allergies. (*Id.* at 47-49.) She stated that she experiences dry mouth, fatigue, dizziness and nausea from her medication four or five times per week, and that these side effects last for a couple of hours. (*Id.* at 56.) She testified that she sees Dr. Murphy or one of her associates every month or two, and that she sees Dr. Sparato every month because of her polycystic ovarian syndrome. (*Id.* at 48.) She stated that she does not receive any mental health treatment. (*Id.* at 51.)

Plaintiff testified that she has a driver's license and is able to drive. (*Id.* at 46.) Plaintiff reported that on a typical day she watches television, plays cards or word games, does crossword puzzles and word finds, and sometimes goes on the computer. (*Id.* at 50-52.) Plaintiff stated that her children visit her once or twice a month. (*Id.* at 52.) Plaintiff reported that she goes out twice a week to food shop with her fiancé and that she drives to visit her grandmother in Riverhead once or twice a week. (*Id.*) She testified that she goes to the laundromat with her fiancé and that he does the laundry while she helps fold it. (*Id.* at 51.) She stated that she does not do the cleaning because of her asthma and that her fiancé does the vacuuming and helps her do the bed. (*Id.*) Plaintiff reported that her fiancé helps her dress. (*Id.*)

Plaintiff testified that she "live[s] in the bathroom, that's what consumes [her] life." (*Id.* at 50.) She reported that she has an irritable bowel and has to use the bathroom about 6 to 12 times a day. (*Id.* at 52.) Plaintiff indicated that she cannot eat and that she eats maybe once a day, but does not know why she still gains weight. (*Id.* at 50.) She stated that eating and stress affect her irritable bowels. (*Id.* at 54-55.) Plaintiff testified that she can sit for fifteen to thirty minutes before she needs to stand because of the spasms in

her spine. (*Id.* at 53.) She also testified that she can stand for five to ten minutes before she needs to sit because she feels like she is going to fall. (*Id.*) Plaintiff stated that she can walk for about a block without having to stop and can lift about five to ten pounds without pain. (*Id.* at 53-54.) She said that the pain in her back goes from the top of her neck all the way down to her ankle. (*Id.* at 53.)

Edna Clark ("Ms. Clark"), a vocational expert ("VE"), also testified at the hearing. (*Id.* at 57-61.) After concluding that plaintiff had no past relevant work, the ALJ asked Ms. Clark to consider a hypothetical individual with the plaintiff's age and education who is limited to light work; can occasionally lift twenty pounds, lift ten pounds frequently; can sit for up to six hours; can stand or walk for approximately six hours in an eight-hour work day with normal breaks; can occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; has unlimited push and pull; must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; and must have ready access to a bathroom. (*Id.* at 57, 58.) Ms. Clark found that such an individual could perform light jobs such as cashier, cafeteria attendant, and office helper. (*Id.* at 58.) Ms. Clark testified that a hypothetical individual who had these limitations and would need up to five minutes each hour for bathroom breaks could only perform the job of office helper. (*Id.* at 59.) Next, the ALJ asked Ms. Clark to consider a hypothetical individual with the plaintiff's age and education who is limited to sedentary work; can occasionally lift ten pounds; can sit for approximately six hours; can stand or walk for approximately two hours in an eight-hour work day with normal breaks; can

occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; has unlimited push and pull; must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation; and must have ready access to a restroom with breaks of up to five minutes each hour. (*Id.*) Ms. Clark testified that such an individual could perform the sedentary job of bench assembly worker. (*Id.* at 59-60.) Ms. Clark then confirmed that a hypothetical individual who had these limitations and would also need to be absent from work three times per month could not perform these jobs or any other jobs in the competitive labor market. (*Id.* at 60.)

After the ALJ finished questioning the VE, plaintiff's attorney posed a question regarding a variation on the ALJ's hypotheticals. (*Id.* at 60-61.) Plaintiff's attorney asked Ms. Clark to consider the same individual with an additional marked limitation in pushing, pulling, carrying, lifting and reaching. (*Id.*) Ms. Clark found that such individual could not perform any of the jobs discussed. (*Id.* at 60-61.)[4]

2. Second Administrative Hearing

The second administrative hearing was held on April 13, 2015 before ALJ Wexler. (*Id.* at 63-85.) Plaintiff, who was represented by counsel, informed the ALJ that they were awaiting medical source statements regarding the frequency of issues plaintiff has with going to the bathroom, from gastroenterologist, Dr. Baranowski, whom the plaintiff had not yet seen.[5] (*Id.* at 66.) The ALJ informed plaintiff that she had two weeks to get her those records. (*Id.* at 67.)

Plaintiff testified that she was born in 1970 and is 45 years old. (*Id.*) Plaintiff stated

---

[4] Plaintiff's counsel advised the ALJ that the hypothetical posed was based on the consultative medical examiner's opinion. (*Id.* at 62.)

[5] Plaintiff was examined by Dr. Baranowski on April 14, 2015. (*Id.* at 685-686.)

that she has not worked for the past fifteen years. (*Id.* at 68.) She stated that she resides in an apartment with her fiancé who works full time and supports her. (*Id.* at 67-68.) Plaintiff testified that she drives occasionally. (*Id.* at 68.) Plaintiff testified that she cannot work because she has irritable bowels, celiac disease, polycystic ovarian syndrome, diabetes, migraines, plantar fasciitis, neck and back pain, and asthma. (*Id.* at 68-69.) She stated that she was born with polycystic ovarian syndrome which makes her lose her hair, gain weight, and causes her hormones to be out of control; she takes Metformin to treat it. (*Id.* at 69, 72-73.) She testified that she was diagnosed with celiac disease when she was ten months old and receives no treatment for it but tries to avoid gluten. (*Id.* at 72.) Plaintiff further testified that her irritable bowels cause her to "live in the bathroom;" she is in the bathroom 6 to 14 times a day. (*Id.*) She testified that because she suffers from malabsorption and must avoid gluten, the only treatment for her irritable bowel syndrome is taking acidophilus, prenatal vitamins, and trying to eat properly. (*Id.* at 70.)

She also stated that she has a lot of pain in her neck and going down her spine into her feet. (*Id.*) She testified that she has received no treatment for her neck and back impairment but intends to go for physical therapy. (*Id.* at 73). Plaintiff stated that she gets migraines from a pinched nerve in her neck and that her asthma and migraines require that she always be in the darkness. (*Id.*) Plaintiff stated that she previously took 800 milligrams of Motrin for her migraines, but since this was affecting her kidneys and her liver, she stopped taking the Motrin and now takes Tylenol and Advil. (*Id.* at 75-76.) She stated that the other drugs the doctors want to give her have a lot of side effects and contain a lot of gluten. (*Id.* at 75.) Plaintiff is diabetic, but is not insulin dependent; she takes losartan for high blood pressure,

Albuterol for asthma, Mucinex for sinus issues, and Prednisone when prescribed. (*Id.* at 73-74.) She stated that she does not smoke. (*Id.* at 74-75.) She testified that she was diagnosed with diabetes last year and that this has caused nerve damage in her feet from the plantar fasciitis. (*Id.* at 73.) Plaintiff stated that her doctor shaves the skin off of her foot to treat her plantar fasciitis and that she cannot stand properly and feels like she is going to go sideways from not being able to balance. (*Id.* at 75.)

Plaintiff testified that she had a colonoscopy and endoscopy in March 2014 and was diagnosed with diverticulitis. (*Id.* at 70.) The ALJ noted that the report in the record dated April 17, 2014 shows that there was no evidence of active inflammation, microscopic colitis or change. (*Id.*) Plaintiff testified that she received a notice in the mail to go for another colonoscopy. (*Id.* at 71.) She stated that she has bleeding hemorrhoids and that something popped so she is waiting to see the gastroenterologist, but there is a two month wait. (*Id.* at 72.)

Plaintiff stated that on a typical day she stays home, watches television, and plays dominoes, cards, and Connect Four. (*Id.* at 76.) Once her fiancé gets home he helps her with the dishes and cleaning up. (*Id.*) She testified that she cooks something light or her fiancé will get something out to eat if she does not feel well. (*Id.*) She stated that she does not like to go out of the house because she does not like to "have to find a bathroom and have to actually use somebody else's bathroom with all the germs." (*Id.*) She testified that she is 5'6" and weighs 290 pounds; she just lost 30 pounds. (*Id.* at 77.) Plaintiff testified that she goes to her grandmother's house once or twice a week and watches television, has something to eat, and takes out her garbage. (*Id.*) Plaintiff testified that she can sit comfortably without having to get up for fifteen to twenty minutes

before she experiences charlie horses in her left leg and pain in her spine. (*Id.* at 78.) She also testified that she can stand for five to ten minutes before she needs to sit. (*Id.*) Plaintiff testified that she can walk about half a block without having to hold onto something and she can carry about five pounds; she stated that she can carry a gallon of milk. (*Id.* at 78-79.) Plaintiff is left handed and testified that she has carpal tunnel syndrome in her left arm that does not require surgery. (*Id.* at 79-80.) She stated that she only wears the brace they gave her about once every two weeks. (*Id.*) She also has arthritis in her hands for which she receives no treatment. (*Id.* at 80.)

VE, Rocco J. Meola ("Mr. Meola") also testified at the hearing. (*Id.* at 81-83.) After concluding that plaintiff had no past relevant work, the ALJ asked Mr. Meola to consider a hypothetical individual with the plaintiff's age and education who is limited to sedentary work; can occasionally lift ten pounds; can sit for approximately six hours; can stand or walk for approximately two hours in an eight-hour work day with normal breaks; can occasionally climb ramps or stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; has unlimited push and pull; is limited to frequent fine fingering, bilaterally; must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation; and must have ready access to a restroom with breaks of up to five minutes each hour. (*Id.* at 81-82.) Mr. Meola found that such an individual could perform sedentary jobs such as preparer, scale operator and table worker laborer. (*Id.* at 82.) Mr. Meola testified that a hypothetical individual who had these

limitations and would also need to be absent from work three to four times per month could not perform these jobs or any other jobs in the competitive labor market. (*Id.*)

After the ALJ finished questioning the VE, plaintiff's attorney posed questions regarding variations on the ALJ's hypothetical. First, plaintiff's attorney asked Mr. Meola to consider that the same individual could only handle and finger occasionally. (*Id.* at 83.) Mr. Meola found that such an individual could not perform the jobs described or any other sedentary unskilled work. (*Id.*) Plaintiff's attorney then added to those limitations that the hypothetical individual was to be off task fifteen percent of the day, and the VE testified that such individual would be precluded from work in the competitive labor market. (*Id.*) Mr. Meola stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.* at 82-83.)

## II. PROCEDURAL BACKGROUND

### A. Administrative History

On September 2, 2011, plaintiff applied for SSI benefits under the Act, alleging that she was disabled beginning on January 26, 2001 due to irritable bowel syndrome, spine problems, celiac disease, and asthma.[6] (*Id.* at 249, 261). Plaintiff's claim was initially denied on December 9, 2011, and plaintiff then requested a hearing before an ALJ. (*Id.* at 90.) On February 19, 2013, plaintiff appeared with her attorney before ALJ

---

[6] Plaintiff previously applied for SSI benefits on September 15, 2003, and on November 22, 2006, an ALJ found that plaintiff was not disabled. (ECF No. 25, Def.'s Mot., Ex. A, *Garcia v. Astrue*, 09-CV-2630 (SJF), (E.D.N.Y. July 22, 2011), at 2-3.) Following

the Appeals Council's denial of review, plaintiff commenced an action in this Court, and on July 22, 2011, the Court granted the Commissioner's motion for judgment on the pleadings and dismissed plaintiff's petition. (*Id.* at 2-27.)

Wexler.[7] (*Id.* at 44, 90.) The ALJ issued an unfavorable decision denying plaintiff's claim on February 27, 2013. (*Id.* at 90-97.) On August 8, 2014, the Appeals Council granted plaintiff's request for review and remanded the case for further proceedings. (*Id.* at 101-02.) On April 13, 2015, ALJ Wexler conducted a second hearing where plaintiff was represented by counsel (*id.* at 63-85), and on June 22, 2015, the ALJ found that plaintiff was not disabled (*id.* at 25-35). The Appeals Council denied plaintiff's request for review of the ALJ's decision on February 17, 2017, making the ALJ's June 22, 2015 decision the final decision of the Commissioner. (*Id.* at 6-9.) On December 6, 2017, the Appeals Council extended plaintiff's time to file a civil action. (*Id.* at 1.)

## B. The Instant Case

Plaintiff filed this *pro se* action seeking reversal of the ALJ's decision on April 28, 2017. (ECF No. 1.) The Court received the administrative record on January 11, 2018. (ECF No. 20.) The Commissioner filed a motion for judgment on the pleadings on March 12, 2018. (ECF No. 24.) By Order dated June 20, 2018, the Court granted plaintiff an extension of time to file her opposition and/or cross-motion and warned plaintiff that failure to respond to this Order would result in the Court treating the motion as fully submitted. (ECF No. 30.) Plaintiff failed to file any opposition papers. The Court has fully considered the defendant's motion and the administrative record.

## III. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) and 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## IV. DISCUSSION

### A. The Disability Determination[8]

A claimant is entitled to disability benefits if the claimant is unable "to engage in any

---

[7] At the first administrative hearing, the plaintiff, through her attorney, amended the alleged onset date to April 29, 2009. (AR at 56.)

[8] "While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application

was filed before the new regulations went into effect." *Maloney v. Berryhill*, No. 16-CV-3899, 2018 WL 400772, at * 1 (E.D.N.Y. Jan. 12, 2018) (citing *Lowry v. Astrue*, 474 F. App'x. 801, 805 n.2 (2d Cir. 2012) (applying and referencing version of regulation in effect when ALJ adjudicated plaintiff's claim)).

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must

determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. Analysis

As set forth below, the ALJ failed to apply the appropriate legal standard in evaluating plaintiff's residual functional capacity, and therefore, the Court remands.

1. The ALJ's Ruling

In concluding that plaintiff was not disabled under the Act, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits discussed *supra*. (AR at 25-35.)

a. Substantial Gainful Activity

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 2, 2011, the date the application was filed. (*Id.* at 27.) Substantial evidence supports this finding.

b. Severe Impairment

At step two, the ALJ found that plaintiff had the following severe impairments: irritable bowel syndrome, celiac disease, asthma, back and neck impairments, diabetes mellitus, obesity and carpal tunnel syndrome. (*Id.*) The ALJ found that these impairments constitute more than slight abnormalities. (*Id.*) The ALJ also referred to allegations of disability from hypertension, plantar fasciitis and pelvic cystic ovarian syndrome, but found that plaintiff's hypertension was well controlled by medication and her plantar fasciitis and pelvic cystic ovarian syndrome caused no more than a minimal limitation in the plaintiff's ability to function. (*Id.*) The ALJ ultimately found that hypertension, plantar fasciitis and pelvic cystic ovarian syndrome are "not severe impairments" that "have no more than a minimal effect upon the [plaintiff's] ability to work." (*Id.*) The ALJ further noted that plaintiff's diagnosis of obesity did not reflect any associated limitations, but that she considered the plaintiff's obesity and the combined effects of obesity with other impairments in the assessment of the claimant's disability and residual capacity. (*Id.* at 28.)

The Court finds that substantial evidence supports this finding. The Court notes that the ALJ could have provided a more detailed explanation as to why plaintiff's other medical conditions did not constitute severe impairments. However, the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments because the ALJ identified other severe impairments at step two of the analysis so that plaintiff's claim proceeded through the sequential evaluation process, and in those subsequent steps, the ALJ considered plaintiff's claims of obesity, hypertension, plantar fasciitis and pelvic cystic ovarian syndrome in addition to her other impairments. *See McAllister v. Colvin*, 205 F. Supp. 3d 314, 326 (E.D.N.Y. 2016) (finding no reversible error committed when ALJ excluded obesity and shoulder impairment as severe because ALJ identified other severe impairments and considered obesity and shoulder impairment in subsequent steps) (citing *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and ALJ considered the "combination of impairments" and "all symptoms" in making determination)).

c. Listed Impairments

At step three, the ALJ found that none of the plaintiff's impairments, alone or in combination, met the severity of any of the impairments that is listed in Appendix 1 of the regulations. (AR at 28.) The ALJ stated that she specifically considered the listed impairments under section 1.00, the standard for musculoskeletal impairments, and under section 3.00, the standard for respiratory impairments and found no objective findings sufficient to meet these standards. (*Id.*) She further noted that her conclusion is supported by medical expert, Dr. Falkove. (*Id.*)

At the outset, the Court notes that the ALJ should have provided a more detailed explanation of her decision as to why plaintiff did not have "an impairment or combination of impairments that meets or medically

equals the severity of one of the impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." (*Id.* at 28.) However, the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments under Appendix 1, because while "the ALJ must justify this determination with more than a brief, conclusory statement that the claimant's conditions" do not meet the listings, *McHugh v. Astrue*, No. 11-CV-00578, 2013 WL 4015093, at *6 (W.D.N.Y. Aug. 6, 2013) (quoting 20 C.F.R. § 416.920(a)(4)(iii)), "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [her] determination was supported by substantial evidence.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x. 109, 112 (2d Cir. 2010) (summary order) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Here, the ALJ's rationale at step three is not something the Court would be "unable to fathom," *Berry*, 675 F.2d at 469, and is supported by other portions of the ALJ's decision, notwithstanding the fact that the ALJ could have been more specific during the step three analysis.

### d. Residual Functional Capacity and Past Relevant Work

Before moving on to step four of the sequential evaluation process, the ALJ first assessed plaintiff's residual functional capacity:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a), in that she can occasionally lift and carry ten pounds, sit for approximately six hours and stand or walk for approximately two hours in an eight-hour day with normal breaks. The [plaintiff] is able to occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; and has an unlimited ability to push/pull. The [plaintiff] is limited to frequent fine fingering bilaterally. She must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, and must have ready access to a bathroom with breaks of up to five minutes each hour.

(AR at 28.)

The ALJ stated that, in considering the plaintiff's symptoms, she followed a two-step process. (*Id.*) The first step required the ALJ to determine if there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the plaintiff's pain or other symptoms. (*Id.*) The second step of the process required the ALJ to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*) When statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the ALJ's consideration of the entire case record. (*Id.* at 28-29.)

The ALJ began her analysis by summarizing plaintiff's hearing testimony, noting that plaintiff alleged disability "due to irritable bowel syndrome, celiac disease,

asthma, back and neck impairments, pelvic cystic ovarian syndrome and plantar fasciitis." (*Id.* at 29.) The ALJ briefly highlighted portions of plaintiff's testimony, including that "she has migraines" for which she "takes only Advil or Tylenol," and that "she has carpal tunnel syndrome, but only wears her brace once every two weeks." (*Id.*) The ALJ pointed to plaintiff's testimony that "she gets no treatment for her neck or back," "she follows a gluten free diet for her celiac disease, but gets no current treatment," and "she has to be close to a bathroom and uses it 6-14 times per day." (*Id.*) On the other hand, the ALJ noted that "[plaintiff's] further testimony was not indicative of total disability." The ALJ pointed to plaintiff's statements that "she can cook, drives occasionally and visits her grandmother 1-2 times per week, . . . lives with her fiancé and spends her days watching television, . . . and that her hobbies include playing cards, dominos and connect four." (*Id.*)

The ALJ next considered a November 30, 2011 consultative examination of plaintiff in which the plaintiff reported that "she cooks four times a week, cleans two times a week and does laundry once a month." (*Id.*) The ALJ further noted that plaintiff reported that "she goes shopping two to three times a month, showers by herself three times a week, dresses herself, watches television, listens to the radio, reads, goes out to do word puzzles and uses the computer." (*Id.*) The

ALJ acknowledged that plaintiff reported that her boyfriend assists her in many of the chores. (*Id.*)

Applying the two-step process, the ALJ stated that, after carefully considering the evidence, she found that plaintiff's "medically determinable impairments could [have] reasonably [been] expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (*Id.*) She concluded that, based on the entire record, "the evidence fails to support [plaintiff's] assertions of total disability." (*Id.* at 33.) More specifically, the ALJ found that plaintiff "suffer[ed] some limitation due to her impairments" that affected her capacity to perform work, but that she retained the residual functional capacity to perform, with certain limitations, the exertional demands of sedentary work.[9] (*Id.*)

In support of this conclusion, the ALJ summarized the opinions of plaintiff's treating physicians, the consultative medical examiner who assessed plaintiff on behalf of the Administration, the impartial medical expert, plaintiff's medical records, and plaintiff's testimony. (*Id.* at 29-33.)

The ALJ gave "great weight" to the February 24, 2013 opinion of medical expert, Dr. Falkove, who opined that "based on the

---

[9] The ALJ stated that "[t]he residual functional capacity accounts for the vocational limitations that would be placed upon the [plaintiff] based on her medically determinable impairments. Specifically, the [plaintiff] has provided evidence and testimony that she suffers from multiple impairments." (*Id.* at 33.) The ALJ explained that "[t]he sedentary exertional level of the residual functional capacity accounts for the limitations that those conditions would place upon her. The lifting requirement of only 10 pounds occasionally takes into consideration issues she would have because of her conditions. The only occasional balancing, stooping, kneeling, crouching and crawling

also gives credence to her back and neck issues, though she gets no treatment. The restriction against ladders, ropes or scaffolds also takes into consideration her limitations imposed upon her by her impairments. In addition, the limitations to frequent fine manipulation accounts for her carpal tunnel syndrome, despite the extremely conservative treatment. The restriction against exposure to pulmonary irritants accommodates her asthma. The residual functional capacity also provides for ready access to a rest room with breaks of up to five minutes each hour giving credence to her testimony regarding her irritable bowel syndrome." (*Id.* at 33-34.)

evidence the [plaintiff] does not have any limitations." (*Id.* at 31.) The ALJ stated that Dr. Falkove's opinion "is well supported by the evidence of record and with the [plaintiff's] statements," noting, "the [plaintiff] stated that she is able to cook, clean, and do laundry; goes out; and can dress and bathe herself independently." (*Id.*)

The ALJ accorded only "little weight," however, to the opinion of gastroenterologist, Dr. Baranowski, who examined the plaintiff on April 14, 2015 for conditions diagnosed as malabsorption and celiac disease. (*Id.*) The ALJ noted that Dr. Baranowski "opined that the [plaintiff] could sit and stand/walk one hour in an eight-hour day and lift five to ten pounds and carry up to five pounds occasionally," and that "plaintiff could never climb stairs, or ramps, kneel, crouch, crawl, or stoop; and could occasionally balance." (*Id.*) Though the ALJ pointed to Dr. Baranowski's remark that "the [plaintiff] would be absent more than three times per month due to her impairments and/or treatment," she concluded that Dr. Baranowski's opinion was "not well-supported by the totality of the evidence or the [plaintiff's] testimony of a wide range of activities of daily living." (*Id.*) The ALJ further reasoned that Dr. Baranowski's opinion was "based on a one-time examination and not on a longitudinal treating history," and that it was "completely inconsistent with his complete lack of any treatment prescribed for her condition." (*Id.*)

The ALJ also accorded "little weight" to the opinion of Dr. Wasty who provided a consultative internal medical examination of plaintiff on behalf of the Administration on November 30, 2011. (*Id.* at 32.) The ALJ noted that Dr. Wasty diagnosed plaintiff with low back pain, neck pain, left hand carpal tunnel syndrome, possibly, fibromyalgia unlikely, multiple tender nodules on arms and back, migraine headaches, polycystic ovarian

syndrome, irritable bowel, celiac disease and asthma. (*Id.*) The ALJ pointed to Dr. Wasty's observation that plaintiff did not appear to be in acute distress, walked with a limp, could squat one-third of the way down, had a normal stance, and used no assistive devices. (*Id.*) The ALJ noted that Dr. Wasty opined that plaintiff had "moderate to marked limitation to squatting and kneeling; moderate limitations to bending forward, long periods of sitting, standing, walking; and moderate to marked limitation to pushing, pulling, carrying, lifting, overhead reaching using bilateral arms." (*Id.* at 32.) She additionally noted Dr. Wasty's opinion that plaintiff had "moderate limitation to twisting, turning of her neck; and she should avoid smoke, dust and known respiratory irritants." (*Id.*) The ALJ concluded that Dr. Wasty's opinion was "based on a one-time examination and not consistent with the totality of evidence and the extremely conservative treatment received." (*Id.*) The ALJ also found that "moderate" and "marked" are undefined terms. (*Id.*)

The ALJ did not explicitly state the weight she assigned to the medical opinions of any of plaintiff's treating physicians. She considered the treatment records of the various doctors at IUMC who treated plaintiff from April 2009 through February 2013 and provided diagnoses of morbid obesity, asthma, polycystic ovary disease, irritable bowel, proteinuria and borderline diabetes. (*Id.* at 29.) The ALJ referenced Dr. Murphy's February 18, 2013 letter summarizing plaintiff's sporadic medical visits for her multiple somatic complaints, including asthma, reported celiac disease and irritable bowel syndrome. (*Id.* at 30.) The letter also stated that plaintiff reported polycystic ovaries, borderline diabetes, chronic sinus congestion, recurrent migraine headaches, chronic generalized pain, polyuria, persistent proteinuria and persistent vaginal discharge. (*Id.*) Specifically, the

ALJ noted that Dr. Murphy's letter stated that "the [plaintiff] feels her conditions render her unable to work" but that "Dr. Murphy did not render an opinion on the claimant's functional ability." (*Id.*)

The ALJ noted that plaintiff was treated by Dr. Spataro, her gynecologist, for a history of endometriosis, polycystic ovarian syndrome, and recurrent vaginal infections. (*Id.* at 31.) The ALJ did not, however, reference the June 17, 2013 letter submitted by Dr. Spataro which stated that plaintiff's medical diagnoses have altered her activity level and hampered her quality of life. (*Id.* at 501-02.)

Additionally, the ALJ considered the multiple medical tests performed on plaintiff, specifically noting that an MRI of the lumbar spine performed in 2003 showed only some disc bulging, and an MRI of the soft tissues of the back performed in June 2003 was essentially unremarkable. (*Id.* at 29.) She also noted an MRI of the lumbar spine taken in October 2003 showed focal disc herniations and possible impingement upon nerve roots, and that plaintiff's orthopedist recommended physical therapy for what he assessed as left sciatica with S1 radiculopathy of the left side. (*Id.*) The ALJ noted April 2009 reports from a renal sonogram and ultrasound showing that plaintiff's kidneys were normal and a May 2009 report of a negative chest x-ray. (*Id.*) She also pointed to laboratory testing in 2010 that revealed mild proteinuria and an abdominal sonogram that showed hepatomegaly with fatty infiltration of the liver. (*Id.* at 30.) The ALJ referenced a 2013 ultrasound of plaintiff's lower extremities that revealed no evidence of lower extremity deep venous thrombosis. (*Id.*)

The ALJ noted that, during a visit to her neurologist in 2013, plaintiff reported only mild symptoms regarding her headaches, but complained of back pain radiating to her left leg. (*Id.*) The ALJ noted that, though her physical exam showed abnormal gait, multiple tender points, headaches and parenthesis, no motor weakness or sensory loss were found, and strength was 5/5 in her lower extremities. (*Id.*) She noted that a 2013 MRI of plaintiff's brain was unremarkable and that diagnostic testing in June 2013 showed moderate spondylosis, multilevel disc space narrowing, desiccation and bulging at T6-7 through T10-11. (*Id.*) She further commented that an MRI of the cervical spine showed posterior central disc herniation at C3-4 and C4-5 impinging the existing left C5 nerve root, and that an MRI of the lumbar spine showed L3-4 moderate central and bilateral foraminal stenosis with disc space narrowing and posterior disc bulging. (*Id.*) The ALJ noted that EMG testing in April 2013 showed no neuropathy and moderate left carpal tunnel syndrome. (*Id.*) She also noted the neurologist's impression was asthma, headaches, neck and low back pain, fatigue, abnormality of gait and carpal tunnel syndrome, and that treatment included medications and a wrist splint for plaintiff's left hand. (*Id.*)

The ALJ also reviewed gastroenterologist Dr. Persky's treatment of plaintiff in 2013 and 2014 for chronic diarrhea. (*Id.* at 31.) She noted that a 2014 colonoscopy showed no evidence of inflammation, microscopic colitis or adenomatous change, and that Dr. Persky assessed hemorrhoids, unspecified, rectal bleeding and diarrhea. (*Id.* at 31-32.)

In assessing the credibility of the plaintiff's statements regarding the severity of her symptoms, the ALJ wrote in her findings that, because a plaintiff's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors

that she must consider in addition to the objective medical evidence when assessing the credibility of the plaintiff's statements. (*Id.*) The factors are the following:

1. [Plaintiff's] daily activities;

2. The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication that [plaintiff] takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, [plaintiff] receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment [plaintiff] uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the [plaintiff's] functional limitations and restrictions due to pain or other symptoms (SSR 96–7p).

(*Id.* at 32-33.)

The ALJ reasoned that plaintiff reported daily activities that are greater than one might expect, given her allegations of total disability. (*Id.* at 33.) For example, the ALJ pointed to plaintiff's testimony that "she can cook, drive occasionally and visits her grandmother 1-2 times each week." (*Id.*) She further noted that plaintiff testified that "she spends her days watching television" and "play[s] cards, dominos and connect four." (*Id.*) The ALJ also noted that plaintiff reported to the consultative medical examiner that "she cooks four times a week, cleans two times a week and does laundry once a month" and that "her boyfriend assists her in many of the chores." (*Id.*) She further noted that plaintiff "goes shopping two to three times a month, showers by herself three times a week, dresses herself, watches television, listens to the radio, reads, goes out to do word puzzles and use the computer." (*Id.*)

Further, the ALJ found that the conservative treatment for plaintiff's alleged conditions does not support her allegation of disability. (*Id.*) The ALJ noted that the plaintiff did not have any orthopedic treatment in the form of injections, physical therapy, surgery, or pain medication and was never hospitalized or visited the emergency room for uncontrolled asthma. (*Id.*)

The ALJ concluded that based on the entire record, including plaintiff's testimony, "the evidence fails to support the claimant's assertions of total disability." (*Id.*)

After concluding her analysis and finding that plaintiff could perform sedentary work with the aforementioned limitations, pursuant to step four of the sequential evaluation process, the ALJ determined that plaintiff did not have any past relevant work. (*Id.* at 34.)

For the reasons discussed *infra*, the Court finds that the ALJ failed to apply the proper legal standard in evaluating the medical opinions of plaintiff's treating physicians and the non-examining medical expert, and improperly placed great emphasis on plaintiff's daily activities. Because of these

errors, remand is necessary because the Court cannot determine whether substantial evidence supports the ALJ's decision.

### e. Other Work

At step five, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (*Id.*) In light of the ALJ's determination that plaintiff's ability to perform all or substantially all of the requirements of the sedentary level of work has been impeded by additional limitations, she considered the vocational expert's testimony in concluding that plaintiff could perform other work existing in the national economy, such as that of a preparer, scale operator, and table worker. (*Id.*) Pursuant to SSR 00-4p, the ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (*Id.* at 35.) Based on the testimony of the vocational expert, the ALJ concluded that, considering plaintiff's age, education, work experience, and residual functional capacity, the plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (*Id.*) As a result, the ALJ found that plaintiff was not disabled within the meaning of applicable law and regulations.

### 2. Treating Physician Rule

The ALJ violated the treating physician rule in three ways: (1) she failed to state the weight given to the opinions of plaintiff's treating physicians; (2) she failed to consider the requisite factors in determining what weight should be accorded those opinions; and (3) she improperly gave "great weight" to the non-examining medical expert's opinion. Thus, remand is required.

### a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g., Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Furthermore, although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole, (iv) whether the opinion is from a specialist, and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in [his] notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-CV-958, 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (citation omitted)). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s] opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

b. Analysis

Here, the ALJ's failure to specify the weight assigned to plaintiff's treating physicians' opinions, and her failure to consider the requisite factors to determine the weight to give those opinions was legal error because it prevents this Court from determining whether the ALJ's decision was supported by substantial evidence. *See, e.g., Taylor v. Barnhart*, 117 F. App'x 139, 140-41 (2d Cir. 2004) (remanding case because ALJ "did not give sufficient reasons explaining how, and on the basis of what factors, [the treating physician's] opinion was weighed," and stating that "we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion" (internal citation and quotation marks omitted)); *Branca v. Comm'r of SSA*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *12 (E.D.N.Y. Sept. 18, 2013) (remanding when the ALJ erred by "failing to explain the weight he assigned to the opinions of plaintiff's treating physicians and failing to properly assess the factors for determining

what weight to give those opinions"); *Featherly v. Astrue*, 793 F. Supp. 2d 627, 631–32 (W.D.N.Y. 2011) (remanding case when ALJ's opinion contained only a "cursory discussion" of the reasons for assigning certain weight to two of plaintiff's treating physicians and failed to mention the weight assigned to the opinions of other treating physicians); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 265-68 (E.D.N.Y. 2010) (finding remand was warranted when the ALJ did not "explicitly" apply and weigh the various factors that must be considered in determining how much weight to give an opinion of a treating physician).

The Court also finds that the ALJ improperly accorded controlling weight to non-examining medical expert, Dr. Falkove's opinion. The Second Circuit has indicated that, by extension of the treating physician rule, ALJs should not rely heavily on findings by consultative examiners or non-examining doctors. *Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) (a "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."). With regard to non-examining physicians' opinions: "[t]he general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'" *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) (citation omitted); *see also Ridge v. Berryhill*, 294 F. Supp. 3d 33, 60-61 (E.D.N.Y. 2018) (finding ALJ incorrectly assigned controlling weight to non-examining medical expert who had completed an interrogatory based on plaintiff's medical records alone and whose opinion was in stark contrast to plaintiff's treating physicians).

Here, impartial medical expert, Dr. Falkove, did not examine plaintiff, but rather, submitted an interrogatory in which he checked a box stating that none of "[plaintiff's] impairments established by the medical evidence, combined or separately, meet or equal any impairment described in the Listing of Impairments." (AR at 511.) The interrogatory stated that "there were no PFT's, CT/MRI's, EMG's, or X-rays and no evidence that [plaintiff] is disabled," and that "there are no exhibits to support any disability at all other than [plaintiff's] obesity." (*Id.* at 510.) Without explanation, the ALJ accorded great weight to Dr. Falkove's opinion, merely stating that his opinion was "well supported by the evidence of record and with the [plaintiff's] statements . . . [that] she is able to cook, clean, and do laundry; goes out; and can dress and bathe herself independently."[10] (*Id.* at 31.) This was legal error. "[T]he conclusions of a

---

[10] Notably omitted from this portion of the ALJ's opinion is the fact that plaintiff required assistance with these tasks. (*See* AR at 32-33, 326.) Plaintiff testified at the first hearing that her fiancé helps her dress, and that he helps with the laundry and does the shopping with her (*id.* at 51), and at the second hearing, she testified that her fiancé helps her with the cleaning and the dishes (*id.* at 76). She also reported to Dr. Wasty that she can dress herself every day with the help of her boyfriend. (*Id.* at 326.) Although the

ALJ may choose what weight to give to plaintiff's testimony and other evidence in the record, failure to consider certain testimony or evidence, or misconstruing such testimony or evidence, warrants a remand. *E.g.*, *Branca*, 2013 WL 5274310, at *13 (citing *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 436 (S.D.N.Y. 2010) (finding that ALJ's decision was not supported by substantial evidence because, *inter alia*, the ALJ "misstated plaintiff's testimony" and "ignored" some of her testimony); *Edel v. Astrue*,

physician who merely reviews a medical file and performs no examination are entitled to little if any weight." *Filocomo v. Chater*, 944 F. Supp. 165, 169 n.4 (E.D.N.Y. 1996).

Accordingly, remand is appropriate as the ALJ violated the treating physician rule by failing to state the weight she accorded the opinions of plaintiff's treating physicians, failing to consider the requisite factors in weighing those opinions, and according controlling authority to the non-examining medical expert's opinion.

### 3. Plaintiff's Credibility

Finally, in assessing plaintiff's residual functional capacity, the ALJ appeared to place great emphasis on plaintiff's daily activities. Though the regulations provide that the ALJ should consider daily activities when assessing a claimant's residual functional capacity, *see* 20 C.F.R. § 404.1529(c)(3)(i), "[i]t is well-settled law in this Circuit that such activity does not, in itself, contradict a claim of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174, 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) (citation and internal quotation marks omitted). Plaintiff's ability to bathe herself, go shopping two or three times a month with help, and do word puzzles, is not necessarily inconsistent with her alleged difficulty of sitting for greater than 15-20 minutes at a time and needing to use the bathroom 6-14 times a day. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act."); *Faherty v. Astrue*, No. 11-

CV-02476, 2013 WL 1290953, at *16 (E.D.N.Y. March 28, 2013) ("[T]he ALJ failed to consider that [p]laintiff's ability to engage in certain daily activities does not necessarily mean she lacks credibility as to the severity of her symptoms. Her ability to drive occasionally and take her children to school or perform mundane tasks of life do not necessarily indicate that [she] is able to perform a full day of sedentary work." (alteration, citation, and internal quotation marks omitted)); *Brown*, 2011 WL 1004696, at *5 (stating that it was legal error for the ALJ to assign "excessive weight" to basic daily activities); *Doyle v. Apfel*, 105 F. Supp. 2d 115, 120 (E.D.N.Y. 2000) ("The activities of daily living that [the ALJ] relied upon, such as reading, watching TV, doing light household work, going out to dinner periodically, and taking occasional trips, are not indicative of an ability to satisfactorily perform a job."). Accordingly, on remand, the ALJ should consider plaintiff's daily activities in light of the other evidence in the record.

---

No. 06-CV-440, 2009 WL 890667, at *17 (N.D.N.Y. Mar. 30, 2009) ("Because the ALJ did not properly complete the credibility analysis and his determination relied on an erroneous recitation of the facts, the Court

recommends that the case be remanded to the ALJ for further analysis, including an accurate characterization of the record . . .").

## V. Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.                    (

JOSEPH F. BIANCO
United States District Judge

Dated: March 27, 2019
Central Islip, New York

                    ***

Plaintiff is proceeding *pro se*, Stacey Garcia, 821 East Main Street, Apt. H12, Riverhead, New York 11901. Defendant is represented by Candace Scott Appleton, Assistant United States Attorney and Richard P. Donoghue, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201.